UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA HOWARD,

                Plaintiff,

v.                                               Case No. 15-cv-0557-bhl

BELINDA SCHRUBBE,
TODD CALLISTER, AND
JOHN O'DONOVAN,

                Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT (DKT. NO. 96)**

       Plaintiff Joshua Howard is a Wisconsin state prisoner who, representing himself, filed this lawsuit, alleging that three individual defendants at the Waupun Correctional Institution (Waupun) violated his constitutional rights. The Court screened Howard's second amended complaint on June 10, 2016 and allowed him to proceed on claims that the defendants violated his Eighth Amendment rights in connection with the dispensation of prescription medication. (ECF No. 38 at 1.) This order addresses the defendants' renewed summary judgment motion. (ECF No. 96.) As explained below, the Court will grant the motion as to defendants John O'Donovan and Todd Callister but deny the motion as to defendant Belinda Schrubbe.

## PROCEDURAL BACKGROUND

       In his second amended complaint, Howard claims that the defendants – a security captain, psychiatrist, and the manager of Waupun's Health Services Unit – violated his Eighth Amendment rights in connection with their roles in dispensing prescription medications to him. Howard has been prescribed several different medications to treat depression, anxiety, and insomnia and claims he has experienced over eighty interruptions in the availability of his medication. He has filed over fifty inmate complaints related to these interruptions over nearly a ten-year period. (ECF No. 39 at 2-3.) Howard alleges that the "continuous and abrupt unavailability of [his] medication has caused him many problems in addition to the migraine headaches and severe nausea he experiences each time his medication is not tapered off." (*Id.* at

1

3.)  Howard generally complains that Waupun uses corrections staff, rather than professional health staff, to dispense inmate medications, a system that he contends results in medication errors and inconsistent medication refill procedures.  (*Id.* at 1-2.)

With respect to the individual defendants, Howard alleges that John O'Donovan, a former Waupun security captain, violated Howard's rights by twice finding him guilty and punishing him for conduct that was a direct result of Howard's having been abruptly cut off from his medication.  (*Id.* at 5.)  Howard alleges that Todd Callister, a Waupun psychiatrist, violated his rights by failing to intercede when Howard complained about the interruptions in his medication.  (*Id.* at 3, 5.)  Last, Howard alleges that Belinda Schrubbe, the manager of Waupun's Health Services Unit, failed to take remedial action to fix problems with the medication distribution system, resulting in Howard not receiving his medication timely.  (*Id.* at 4-5.)  Howard also claims Schrubbe violated his rights by maintaining a constitutionally infirm medication-distribution system, leading to injuries, including migraine headaches, severe nausea, and disruptions in sleeping patterns.  (*Id.* at 3-5.)

On March 19, 2018, the Court denied defendants' first motion for summary judgment.  (ECF No. 92.)  In that motion, defendants argued that the statute of limitations barred Howard's claims against O'Donovan and Callister in their entirety, and barred consideration of claims against Schrubbe based on instances of medication availability between 2004 and April 2009.  (ECF No. 56 at 9, 11 n.3.)  They also argued that Howard's claim against Schrubbe failed as a matter of law to the extent that it occurred after April 2009.  (*Id.* at 11-12.)  In denying the motion, the Court concluded that defendants had waived the statute of limitations defense.  (ECF No. 92 at 9.)  The Court also explained that it could not fully evaluate claims against Schrubbe based on pre-2009 events because defendants had not addressed the events that arose before that time.  (*Id.* at 10.)  The Court ruled that either party could file a motion for summary judgment addressing the substance of Howard's claims.  (*Id.*)  On May 31, 2018, defendants renewed their summary judgment motion.  (ECF No. 96.)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);  *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668

(7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## BACKGROUND FACTS[1]

Howard is an inmate in the custody of the Wisconsin Department of Corrections (WDOC) and was confined at Waupun at all times relevant to this case. (ECF No. 105 ¶1.) Defendant Todd Callister is employed by the WDOC as a psychiatrist. (*Id.* ¶2.) Defendant John O'Donovan previously worked as a security captain at Waupun. (*Id.* ¶3.) Defendant Belinda Schrubbe was the manager of the Health Services Unit (HSU) at Waupun from December 9, 2001 to February 27, 2015. (*Id.* ¶4.)

### A. Waupun's Medication Delivery and HSU Policies

Like most WDOC institutions, Waupun uses correctional officers to deliver medications to inmates as part of their normal job duties. (ECF No. 105 ¶19.) An orientation program educates officers on how to deliver medications and officers also receive annual education on this process. (*Id.*) Correctional officers deliver the controlled medications and document compliance on a DOC-3026 "Medication Treatment Record." (*Id.* ¶21.) As the HSU manager,

---

[1] Howard argues that defendants' failure to amend their objections to proposed findings of fact that were filed in connection with their previous summary judgment motion should result in those facts being deemed conceded. (ECF No. 102 at 1.) But that motion was previously resolved and is no longer before the court. Defendants' failure to amend responses related to that prior motion does not result in any admissions.

3

Schrubbe did not oversee the officers who delivered the medications, nor did she have the authority to change the WDOC's medication delivery policies or practices. (*Id.* ¶20.)

The medication delivery system allowed inmates to have some self-administered medication in their cells to take as needed. (*Id.* ¶22.) Other medications, including psychotropic medications, like the Fluoxetine and Paroxetine prescribed for Howard, are officer-controlled and come in a blister pack. (*Id.*) At Waupun, controlled medications (other than certain narcotics) are taken from the sergeant's cage and given to the correctional officers who place them on a cart and deliver them to the inmates who are locked in their cells. (*Id.* ¶23.)

Corrections officers are supposed to document the distribution of medications. (*Id.* ¶21.) If the inmate takes his medication, the staff member is to initial the appropriate box on the Medication Treatment Record. (*Id.* ¶24.) Staff should also document on the form if the inmate refuses the medication or was absent at the time of delivery, and if the medication was unavailable at the time of delivery, was withheld per instructions from HSU, or was sent with the inmate off-site (because of work or an off-site appointment.) (*Id.*) Howard claims that officers do not always document whether the medication is unavailable, as his Medication Treatment Record shows 2100 blank spaces when medication was not available. (*Id.*)

Each night, the third-shift sergeants review medication records and blister packs for those inmates on controlled medications in the sergeants' cell halls to determine if a refill is needed. (*Id.* ¶28.) If there is less than a four-day supply, the sergeant writes the inmate name, number, medication name, and medication dose on the DOC-3399 "Medication Distribution" log. (*Id.*) The Medication Distribution log is then sent to the HSU medication room and processed that day or the next day, depending on business hours of operation. (*Id.*) If the HSU medication room has the medication in stock, the medication is sent out that day. (*Id.* ¶30.) If not, the refill order is sent to the Bureau of Health Services' Central Pharmacy for production. (*Id.*)

When inmates enter Waupun, they are given an inmate handbook informing them of the institution's rules, policies and procedures. (*Id.* ¶31.) The handbook directs inmates to keep track of their controlled and non-controlled medication, including how much they have available. (*Id.*) The handbook directs inmates to obtain medication refills as follows:

> 1. *Complete a medication refill request (DOC-3035C) and place it in the HSU box 5 days prior to being out of the medication, controlled and non-controlled.*

4

> 2. *If you don't receive your medication 2 days prior to running out, write to the HSU manager using a Health Services Request (DOC-3035). Fold the Health Services Request and put on the outside, "For HSU Manager Only – MED" Place in HSU box.*
>
> 3. *The day prior to running out, if you still haven't received your medication, ask the Sergeant in your cell hall to call the HSU Manager.*
>
> *HSU responds to every written medication request in writing. If you have received a response back informing you that your medication was sent, ask the Sergeant for it if it is non-controlled. If the medication is controlled, it has been placed in the mediation cart in back-up. If you do not receive a response back, HSU did not receive your request.*

(*Id.*)

Howard insists he was not given a handbook upon arriving at Waupun in 2002. (*Id.*) He also claims that the excerpts cited by defendants were first published in a 2010 revision of the handbook that was published and distributed at some point after 2011. (*Id.*)

### B. Howard's Repeated Complaints Over His Medication

During the relevant period of his incarceration, Howard was prescribed several medications, including medications for anxiety and depression. (ECF No. 105 ¶14.) The record shows that over a ten-year period, Howard complained repeatedly about outages of his medications. Between January 2005 and February 2015, Howard filed 38 formal complaints about the distribution of his medications. (*Id.* ¶39.) These complaints were filed under institution procedures that allow inmates to file grievances/offender complaints through an Inmate Complaint Review System. (*Id.* ¶35.) Howard's complaints and the institution's responses to those complaints are described below.

#### 1. Howard's Initial Complaints (2005-2008)

Howard filed his first complaint related to a medication outage on January 10, 2005. (ECF No. 105 ¶41.) The complaint concerned an alleged medication outage from January 2 to January 6, 2005, but also referred to prior outages. (*Id.*) In response, a complaint examiner contacted Schrubbe, who reviewed Howard's medical records and concluded that he should not have run out of the medication. (*Id.* ¶42.)

Nearly a year and a half later, on June 16, 2006, Howard filed another complaint, this time concerning an outage of Bupropion/Wellbutrin. (*Id.* ¶44.) Two months later, on August 31, 2006, Howard filed a third complaint, this timing alleging a four-day outage of his "night

5

meds." (*Id.* ¶47.) In response to both complaints, Schrubbe was contacted and responded by reviewing Howard's medical records and making findings about the validity or invalidity of his complaints. (*Id.* ¶¶ 45, 48.) With respect to his June 16 complaint, she noted that Howard's psychiatrist, Dr. Froelich, had discontinued the medication on May 31, 2006, after Dr. Froelich told Howard there was nothing he could do to assure that (1) the staff submits refill slips on time and (2) HSU fills them in a timely manner. (*Id.* ¶46.) And she concluded it was not possible for Howard to be out of Benadryl on the days he alleged in his August 31, 2006 complaint, attributing any outage to officer error, not the lack of a refill. (*Id.* ¶48.)

The number of Howard's complaints picked up in 2007; he filed four complaints that year. He filed complaints on March 12, 2007 and April 23, 2007, concerning medication outages from February 20 to February 25 and April 14 to April 16, 2007, respectively. (*Id.* ¶¶49, 51.) Howard filed two more complaints in November and December of 2007. Schrubbe responded to all four complaints, investigating them and making findings. (*Id.* ¶¶50, 54, 56, 58.). With respect to the alleged February 2007 outage, Schrubbe found that, according to the HSU records, the plaintiff should never have been without medication. (*Id. ¶50.*) Schrubbe concluded that the prison's refill procedure was not followed in April 2007, leaving Howard to go without his Diphenhydramine for two days in April 2007. (*Id.* ¶54.) Howard's November 2007 complaint was affirmed after Schrubbe determined that Howard went one day without his sleep medication, but noted that the outage did not place Howard at risk of serious injury or death. (*Id. ¶56.*) Schrubbe again confirmed that Howard did not receive his medication on the dates reported in his December 2007 complaint. (*Id. ¶58.)*

During 2008, Howard complaints increased – he filed *ten* complaints about his medication in that year alone. Howard filed complaints on January 3, 2008 (medication outage from December 25 to December 29, 2007); January 28, 2008 (medication outage on January 14, 2008); January 28, 2008 (outage of Paroxetine from January 21 to January 24, 2008); March 31, 2008 (outage of Paroxetine from March 22 to March 24, 2008); April 30, 2008 (outage of Diphenhydramine on April 27, 2008); June 10, 2008 (outage of Diphenhydramine from May 27 to June 4, 2008); June 30, 2008 (outage of Diphenhydramine from June 16 to June 25, 2008); July 25, 2008 (outage of Diphenhydramine from July 15 to July 23, 2008); October 13, 2008 (medication outage on September 30, 2008); October 27, 2008 (outage of Paroxetine from October 22 to October 23, 2008) (*Id.* ¶¶59, 61, 64; 66, 68, 70, 72, 76, 80, & 82.) Other than the

6

October 13 complaint, which the examiner rejected as too vague, all the complaints were promptly investigated by Schrubbe. (*Id.* ¶¶60, 62, 65, 67, 69, 71, 75, 77, & 83.) She concluded that Howard was in fact likely out of medication from December 25-29, 2007, as alleged in the January 3, 2008 complaint, an outage Howard insists resulted from officer-error. (*Id.* ¶60.) Schrubbe concluded that the medication log did not show lapses as alleged in January, although Howard insists the log shows otherwise. (*Id.* ¶¶62 & 65.) Her investigations of other complaints show potential documentation errors and instances in which officers indicated Howard was "out" of medication. (*Id.* ¶¶67, 69, 71, 72, 75, 77 & 83.) She also concluded on more than one occasion that the HSU had sent medication out for Howard when notified that he was out. (*Id.* ¶¶71, 75, 83.)

### 2. Schrubbe's Efforts to Address Howard's Ongoing Complaints (2009-2010)

Howard filed two more medication-outage complaints in January and February 2009. (ECF No. 105 ¶¶84 & 86.) In response to the January complaint, the examiner's report shows Schrubbe was considering ways to address Howard's ongoing complaints:

> *Approximately 18 of Howard's ICRS submissions at WCI allege medication was not delivered timely, that the supply had run out, a combination of the two scenarios. Inmate Howard has repeatedly been instructed to contact HSU at once when he is out of medication, it appears he does not do this despite his claims to the contrary. There is no verifiable communication from Howard to HSU that he cannot sleep and has stomachaches or headaches.*
>
> *Considering the frequency of this type of complaint from inmate Howard, it appears that the way medication is delivered to him should be revised as his submissions of this nature far exceed the norm. With that, and noting that he hadn't contacted HSU regarding his self-reported side affects [sic] from the medication shortage, recommendation is made to affirm the complaint with modification regarding the medication delivery system to inmate Howard. The medical and security variable encompassing this issue are beyond the purview of the ICRS. As such, a copy of the complaint will be sent to HSM Schrubbe and Security Director Strahota for follow-up on the medication delivery issue referenced above.*

(ECF No. 69-1 at 153 (Ex. 2009A-03)).

Howard's complaints stopped for a few months, but in or around June 2009, Schrubbe spoke with Waupun's security director and deputy warden regarding Howard's complaints of security staff not requesting timely refills. (ECF No. 105 ¶89.) They assured her they would address the issue with the cell hall sergeants. (*Id.*)

7

On July 1, 2009, Howard filed another complaint, alleging he was without Paroxetine from June 22 to June 24, 2009.  (*Id.* ¶90.)  The investigator again contacted Schrubbe regarding the plaintiff's complaint, (*Id.* ¶91), and reported:

> *HSM Schrubbe has reviewed the matter and states, "According to patient's medication record, the Paroxetine was not available on the 24th. HSU did receive request from patient on 6-25-09 and HSU sent the medication out. Patient was seen by psychiatrist on 7-9-09 and patient did not mention any concerns about missing medication and withdrawal symptoms. HSM has brought the issue of security not requesting refills timely to the attention of Security Director and Deputy Warden as of a week ago. This issue is being addressed with cell hall sergeants."*
>
> *From an ICRS standpoint, nothing can be recommended as a remedy to this matter over and above what actions have already been taken according to the statement from HSM Schrubbe. I will opine, however, that this is a consistent problem with inmate Howard's medications, and prior ICRS actions have suggested that, considering that inmate Howard's chronic problems with medication refills and delivery, a more specific tracking system should be developed for all aspects of Howard's medication needs. A copy of the complaint will be sent to HSM Schrubbe, Deputy Warden Meisner and to Security Director Strahota for follow-up actions deemed necessary.*

(ECF No. 69-1 at 169, Ex. 2009C-04.)  Howard filed no further complaints in 2009.

Howard resumed his complaints in the Spring of 2010.  On April 26, 2010, Howard filed a complaint, contending he was out of Diphenhydramine from April 20 to April 22, 2010 resulting in insomnia, stomachaches, and headaches.[2]  (ECF No. 105 ¶92.)  Howard re-filed this complaint on May 13, 2010. (*Id.*)  Schrubbe investigated and concluded Howard had missed one dose of Diphenhydramine on April 22, 2010 and the medication was refilled on April 23, 2010 after the plaintiff sent a refill request to HSU.  (*Id.* ¶93.)  She noted that Howard had not written to the HSU regarding the outage until April 28, 2010 and that HSU responded the next day, on April 29, 2010.  (*Id.* ¶94.)   She also concluded he had not reported experiencing any symptoms due to the unavailability of his medication.  (*Id.*)  Howard did not file any other complaints in 2010.

---

[2] Under Waupun's Inmate Complaint Review System, a complaint examiner may "return" a complaint to an inmate and direct the inmate to attempt to resolve the issue before accepting the submission for filing.  (ECF No. 105 ¶36.)  Starting in 2010, the complaint examiner frequently returned Howard's complaints to him, with instructions to try to work out his medication issues directly with corrections staff or Schrubbe.  Most if not all of these efforts failed, and Howard simply refiled his complaints.

### 3. Howard's Complaints Continue (2011-2014)

Howard's complaints resumed in 2011. On January 4, 2011, he filed a complaint that he was out of Paroxetine from December 17 to December 20, 2010. (ECF No. 105 ¶96.) The examiner contacted Schrubbe, who reviewed Howard's medical file and found it was possible that he might have been out of medication. (*Id.*) But she noted that HSU only sends out medication when requested and neither Howard nor the cell hall sergeant requested the medication. (*Id.*) She further observed that Howard did not report the outage to HSU until December 28, 2010. (*Id.* ¶97.) She advised Howard to request a refill from HSU when he noticed his card getting low. (*Id.*) Howard filed two more complaints about medication outages in April and October 2011. (Id. ¶¶98 & 101.) In both instances, the examiner returned the complaints to him, only to have Howard refile the complaints. (*Id.*) Schrubbe investigated both sets of complaints, each time noting that Howard had not requested help from HSU for his alleged symptoms. (*Id.* ¶¶99 & 102.)[3]

Between January and October 2012, Howard made five more medication-related complaints. (*Id.* ¶¶103, 105, 107, 109, & 111.) In each case, Schrubbe was contacted by the examiner and made findings concerning the alleged outages. (*Id.* ¶¶104, 106, 108, 110, & 112-13.) For three of the complaints, Schrubbe noted that Howard had not contacted the HSU to report any of the symptoms he alleged in his complaint and that he waited until running out of medication before complaining. (*Id.* ¶¶104, 106, & 110.) For one of these three, Schrubbe found that the medication was likely available, but that maybe the officer could not find it on the cart. (*Id.* ¶106.)

This pattern continued through 2014. Howard filed and/or refiled medication outage complaints on April 23, 2013, alleging his sleeping medication was not available on the unit on April 18, 2013. (*Id.* ¶114.) The examiner contacted Schrubbe, who investigated and found that Howard's medication log showed his medications had in fact been distributed. (*Id.* ¶115.) Howard filed another complaint on May 14, 2013, which was returned to him and then refiled on May 31, 2013. (*Id.* ¶116.) This complaint concerned an outage of Diphenhydramine from May 9-12, 2013, an outage that Schrubbe investigated and found that HSU had sent the medication to

---

[3] The plaintiff disputes that Schrubbe could not confirm whether the plaintiff was given his April 6, 2011 dose of Diphenhydramine by looking at his medication record because he states that the med log clearly shows that he was not given his Diphenhydramine medication on April 5 and 6. (*Id.* ¶99.)

9

Case 2:15-cv-00557-BHL   Filed 02/04/21   Page 9 of 19   Document 114

the cell hall on May 3, but the medication was returned to HSU on May 11 for some unknown reason. (*Id.* ¶117.) HSU sent the medication back to the cell hall on May 12. (*Id.*)

Due to Howard's continued complaints regarding lapses in his medications, sometime between June and August 2013, Schrubbe verbally informed the nursing staff that they should automatically issue a thirty-day supply of Howard's officer-controlled medications on the seventh of every month. (*Id.* ¶118.) Schrubbe placed a paper calendar in the medication room at Waupun with Howard's name on the seventh of every month. (*Id.*)[4] Schrubbe also wrote a note directly on Howard's Medication Profile sometime around March 2014 so that any new nursing staff filling in for regular staff were aware of the directive. (*Id.* ¶119.)

Amid these latest efforts by Schrubbe, on June 17, 2013, Howard filed another complaint, which was returned to him and then refiled on July 2, 2013. (*Id.* ¶120.) In August 2013, the Bureau of Health Services' Nursing Coordinator Alsum contacted Schrubbe regarding Howard's complaint that his Fluoxetine was unavailable on June 11, 2013. (*Id.* ¶121.) Schrubbe found that the medication was sent to the cell hall on June 12, 2013 and, according to the medication sheet, he received it. (*Id.*) Schrubbe noted that missing one dose does not present any danger or health risk to the patient. (*Id.*)

Howard filed and refiled additional complaints about medication outages from October 2013 through July of 2014. (*Id.* ¶¶122, 126, 129, 131, & 134.) In each instance, a complaint examiner contacted Schrubbe and she investigated the outage. (*Id.* ¶¶123-24, 127, 130, 132, & 136.) Schrubbe's findings confirm that Howard continually waited until his medication ran out, only to then later file a complaint about the outage. (*Id.* ¶¶124, 128, 130, 133, & 136.) On two or three occasions, the medication had been on the unit, but corrections officers had apparently been unable to locate the medication. (*Id.* ¶¶124, 133, & 136.).

### C. The Roles of O'Donovan and Callister in Howard's Medication Complaints

Howard's complaint against Callister relates in part to the medication Bupropion. Howard discontinued taking the medication Bupropion in May 2006 after a conversation with his psychiatrist at the time, Dr. Froelich. (ECF No. 105 ¶15.) Howard's first appointment with Callister was on October 19, 2006, five months after he stopped taking Bupropion. (*Id.*) At that

---

[4] Howard disputes that Schrubbe gave this order and he states that, even if she did, the records show her staff did not carry out the order. (*Id.*) According to Howard, his medication profile shows that medications were not issued on the seventh of the month, or any other particular date, before or after the summer of 2013. (*Id.*)

appointment, Howard claims he expressed a desire to go back on Bupropion if Callister could do something about the regular unavailability of the medication. (*Id.*) Callister declined to prescribe the medication. *Id.*

Howard met with Callister again about five and a half years later, on March 7, 2012. (*Id.* ¶17.) According to Howard, a complaint examiner had confirmed on February 24, 2007 that Schrubbe would review Howard's night medications with Callister due to chronic outages. (*Id.*) When Howard met with Callister on March 7, 2012, he explained that Paroxetine had been effective but that he worried about it running out again. (*Id.*) Howard complains that instead of taking action or developing a plan with Schrubbe, Callister suggested Fluoxetine as an alternative because the withdrawals would be less severe when Howard inevitably experienced outages with the new medication. (*Id.*) On March 7, 2012, Callister prescribed a trial of Fluoxetine on March 7, 2012 as an alternative to Paroxetine. (*Id.*)

Howard's complaints against O'Donovan relate to two hearings on adverse conduct reports issued to Howard, one on December 20, 2007 and the other on January 17, 2008. The first conduct report alleged that Howard failed to report for his two-hour legal library court deadline pass. (*Id.* ¶7.) The officer went to Howard's cell and directed him to honor the pass, but Howard refused. (*Id.*) Howard was not on sick cell, another pass, or a visit at the time he refused his legal library pass. (*Id.*) Institution policies and procedures require inmates to go on every pass they receive unless they are on sick cell, another pass, or a visit. (*Id.* ¶8.) Failure to honor a received pass may result in disciplinary action. (*Id.*) At the disciplinary hearing, O'Donovan found Howard guilty of Disobeying Orders and Violations of Institution Policies and Procedures. (*Id.*) He imposed a disposition of twenty days loss of recreation. (*Id.*) In Howard's appeal, he reiterated that he had not slept in two days because his medication ran out. (*Id.*) On appeal, O'Donovan's decision was affirmed and the sentence was modified to a reprimand. (*Id.* ¶9.)

The second conduct report alleged that on December 30, 2007, Howard had refused to stand for count after hearing the count announcement. (*Id.* ¶11.) When the officer told him it was count time, Howard replied that he was on "sick cell" and the officer said that "even on sick cell you have to stand for count." (*Id.*) Institution policies and procedures require inmates to stand in clear view at the bars of their cell with their cell light after the count announcement. (*Id.* ¶12.) At the disciplinary hearing, O'Donovan found Howard guilty of Disobeying Orders and

11

Violations of Institution Policies and Procedures, and not guilty of Lying. (*Id.* ¶13.) Howard received a disposition of sixty days disciplinary separation. (*Id.*) On appeal, the warden affirmed O'Donovan's guilty disposition on the Disobeying Orders charge but removed the guilty finding for Violations of Institution Policies and Procedures charge. (*Id.*)

## ANALYSIS

"The Eighth Amendment's proscription against 'unnecessary and wanton infliction of pain' is violated when prison officials demonstrate 'deliberate indifference to serious medical needs' of prisoners – whether the indifference 'is manifested by prison doctors in response to prison needs or by prison guards in intentionally denying or delaying access to medical care.'" *Lewis v. McLean*, 864 F.3d 556, 562 (7th Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A deliberate indifference claim contains both an objective and a subjective component. "[A] prisoner must first establish that his medical condition is 'objectively, sufficiently serious,' and second, that prison officials acted with a 'sufficiently culpable state of mind' – i.e., that they both knew of and disregarded an excessive risk to inmate health." *Id.* at 562-63 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Objectively serious medical needs are those that have either been diagnosed by a physician and demand treatment or are "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017) (quoting *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012)). "To determine if a prison official acted with deliberate indifference, [courts] look into his or her subjective state of mind." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996)). "[S]howing negligence is not enough." *Id.* (citing *Estelle*, 429 U.S. at 106). "Even objective recklessness – failing to act in the face of an unjustifiably high risk that is so obvious that it should be known – is insufficient to make out a claim." *Id.* (citing *Farmer*, 511 U.S. at 836-38). "[A] plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id.* (citing *Farmer*, 511 U.S. at 837).

### A. Defendant O'Donovan

The defendants contend that Howard's claim against O'Donovan fails because there is "no constitutional requirement to absolve an inmate of his misbehavior just because the inmate claims there was a factor mitigating the behavior." (ECF No. 97 at 10.) Howard insists that his claim against O'Donovan is "a common-sense" instance of deliberate indifference to a serious

12

medical need. (ECF No. 102 at 8.) Howard asserts that a reasonable jury could find that O'Donovan violated the Eighth Amendment when he punished the plaintiff for conduct that resulted directly from HSU-correctional staff's failure to provide a timely refill of his sleeping medication. (ECF No. 100 at 8.)

Contrary to Howard's assertions, a reasonable jury could not conclude that O'Donovan acted with deliberate indifference to his serious medical need. Howard faults O'Donovan for finding him guilty on two conduct reports occurring after instances in which Howard had not received his medication before the incidents. To support this claim, he cites *Coleman v. Wilson*, 912 F. Supp. 1282, 1320 (E.D. Cal. 1995) ("[B]eing treated with punitive measures by the custody staff to control the inmates' behavior without regard to the cause of the behavior . . . violated [a] seriously mentally ill prisoner's Eighth Amendment rights."). (ECF No. 100 at 8.) *Coleman* is not binding on this Court, but even if it was, its holding does not help Howard here. The record does not support a finding that O'Donovan was trying to control Howard's behavior; he was simply the hearing officer for hearings on other officers' conduct reports. And O'Donovan's actions do not rise to an Eighth Amendment violation because he did not have anything to do with Howard's medical needs. *See Estelle*, 429 U.S. at 104-05 (The Eighth Amendment prohibits deliberate indifference "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."). The Court will therefore grant the defendants' motion for summary judgment as to Howard's claim against O'Donovan.

### B. Defendant Callister

Defendants contend that Howard's claim against Callister fails both because Howard did not exhaust his administrative remedies and because no jury could find in his favor on the merits. (ECF No. 97 at 11.) The Court will address the defendants' exhaustion argument first.

Defendants argue that Howard did not exhaust his claim against Callister because Howard did not file an offender complaint about Callister's alleged failure to intercede regarding interruptions of his medication. (*Id.* at 10.) Under the Prison Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions ... until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). The exhaustion requirement is mandatory and "applies to all inmate suits." *Woodford v. Ngo*, 548 U.S. 81 (2006); *Porter v. Nussle*, 534

13

U.S. 516, 524 (2002). The exhaustion requirement's primary purpose is to "alert[ ] the state" to the problem "and invit[e] corrective action." *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004).

Section 1997e(a) requires "proper exhaustion," *Woodford*, 548 U.S. at 93; *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002), which means that the prisoner must follow prison rules when filing the initial grievance and all necessary appeals, "in the place, and at the time, the prison's administrative rules require." *Burrell v. Powers*, 431 F.3d 282, 284-85 (7th Cir. 2005). "[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies." *Pozo*, 286 F.3d at 1024. Because exhaustion is an affirmative defense, defendants bear the burden of establishing that the plaintiff failed to exhaust his available remedies. *Jones v. Bock*, 549 U.S. 199, 216 (2007).

Howard filed multiple offender complaints regarding his missed medications. He faults Callister for not addressing the regular unavailability of his medication. Defendants' argument that Howard failed to exhaust his claim against Callister runs counter to cases stating that a prisoner need not name any particular defendant in a grievance to properly exhaust his claim, *Jones v. Bock*, 549 U. S. 199, 219 (2007), and that a prisoner need not mention each specific instance in a chain of misconduct by prison officials, *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). Thus, the Court concludes that Howard has exhausted as to his claim against Callister.

Turning to the merits, defendants contend that Callister was not responsible for the discontinuance of Howard's Bupropion and, as such, his claim against Callister fails due to lack of personal involvement. (ECF No. 97 at 11.) They also contend that Howard has not identified any action or inaction by Callister that would constitute a constitutional violation. (*Id.*) In response, Howard acknowledges he discontinued his Bupropion medication before Callister started at Waupun, but he contends that Callister became personally responsible when Howard notified him of the problem, and he failed to act. (ECF No. 102 at 2-3.) According to Howard, Callister's "inaction continued from that day in 2006 and continued throughout his tenure at WCI which resulted in not only hundreds of instances of withdrawal of all of the medications he prescribed the plaintiff, but also years of going without two effective medications, Bupropion and Paroxetine." (*Id.* at 3.)

Section 1983 limits liability to public employees who are personally responsible for a constitutional violation. *Burks v. Raemisch*, 555 F.3d 592, 595-96 (7th Cir. 2009). For liability to attach, the individual defendant must have caused or participated in a constitutional violation. *Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). Howard cannot maintain a claim against Callister based on the discontinuation of his Bupropion because the medication was discontinued before Howard's first meeting with Callister.

Howard faults defendant Callister for his inaction regarding the regular unavailability of Bupropion medication, a medication that Howard had stopped taking about five months before his first meeting with Callister. Howard's supplemental brief sets forth his claim against Callister and it cites to his previously filed proposed findings of fact. (ECF No. 100 at 9-11.) Howard describes Callister's personal involvement as follows:

> Defendant Callister was personally informed of the problem on his first meeting with the plaintiff and he failed to act throughout his tenure at WCI which lasted until 2016. When the plaintiff agreed to start taking Bupropion in 2008, the defendant was aware that the plaintiff was going to face the same painful episodes which caused him to stop taking the medication in the first place. In the following years the defendant was notified by the plaintiff that nothing had improved, he had been directly brought into the ICRS remedy process and his email with Schrubbe demonstrates that he was aware of the chronic unavailability of medication he prescribed to his patients. (PPFF 57) In March of 2012, the plaintiff told Defendant Callister that while Paroxetine was helping him he decided not to take it anymore because he had just went through a particularly awful withdrawal and did not want to keep going through them. (PPFF 46) The defendant was aware that until his departure from the DOC that the plaintiff had continued to abstain from taking this medication that had been effective in treating his symptoms. (P-Ex. Y at 23-28) While the defendant's failure to act resulted in the plaintiff foregoing two medications from 2006 to 2008 and 2012 to 2018, it also resulted in the plaintiff suffering hundreds of episodes of withdrawal from 2006 to 2017. During that entire (11) year period Defendant Callister was aware of the continuous outages and he made no attempt at resolving the problem, even when the plaintiff directly asked him for help.

(ECF No. 11 at 10-11.)

A reasonable factfinder could not conclude that Callister acted with deliberate indifference to Howard's medical needs. Howard has not established that Callister had any personal involvement regarding the medication interruptions. While Howard allegedly told Callister that he missed some medication doses, there is no indication that Callister took any actions or had anything to do with the unavailability of Howard's medication. Howard's broad

15

contention that Callister's inaction resulted in him suffering hundreds of episodes of withdrawal from 2006 to 2017 is not supported by the record, nor is Howard's statement that Callister was aware of the outages for eleven years. Because the record, including the exhibits referenced in Howard's supplemental brief, does not support a finding that Callister acted with deliberate indifference, the court will grant defendants' motion for summary judgment as to Callister.

### C. Defendant Schrubbe

The defendants contend that Howard's claim against Schrubbe fails because he did not suffer a cognizable harm due to Schrubbe's actions or inactions. (ECF No. 97 at 12.) The defendants assert that Schrubbe, in her role as HSU manager, did not oversee the officers or have the authority to change WDOC policy on medication delivery; Schrubbe repeatedly told Howard to monitor the quantities of his medications and submit refill requests before the medications ran out; and Howard failed to do so in any of the thirty-eight time periods that medication may have been unavailable to him. (*Id.* at 13.) Defendants also contend that Howard cannot meet either the objective or subjective element of an Eighth Amendment claim. (*Id.* at 14-17.) Lastly, they contend they are entitled to qualified immunity. (*Id.* at 18.)

In response, Howard contends defendants' "refill defense is a transparent attempt to distract from the failure to solve the actual problem caused by the distribution of medication by untrained correctional staff while placing the blame on the plaintiff." (ECF No. 102 at 5.) Howard contends that the "physical, mental and emotional impact resulting from being abruptly cut off of psychiatric medication is common sense and a medical diagnosis is unnecessary." (*Id.*) He also contends that Schrubbe "concedes her own indifference" because she: (1) "admits that she took no action until over (4) years after the plaintiff's first complaint in 2005[;]" (2) her June 2009 conversation with the security director only occurred after complaint WCI-2009-14719 even though the ICE [institution complaint examiner] had sent Schrubbe and the security director copies of five affirmed complaints for review of the medication outages in 2006, 2007, 2008, and earlier in 2009; and (3) "[i]n addition to her apparently ignoring five previous opportunities to address the issue with the Security Director, the fact that in 2009 her conversation concerned staff's refill requests also demonstrates a willful ignorance considering that between 2004-08 the records would have shown 570 of the 630 missed doses occurred while medication was on the unit." (*Id.* at 6.)

16

Howard filed thirty-eight inmate complaints between 2005 and 2015 alleging that he did not receive doctor-prescribed medication for his depression, anxiety, and insomnia. Most of these complaints described withdrawal symptoms such as severe nausea, headaches, inability to sleep for twenty-four hours or more, lightheadedness, pain, anxiety attacks, suicidal tendencies, throwing up, depression, and stomachaches. Whether Howard's medical need was the underlying condition for which he was prescribed the medication, or the withdrawal symptoms from not receiving the medication a doctor determined he should have, a reasonable fact-finder could conclude that Howard had a serious medical need during the relevant time period. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) ("A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention."); *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001) ("[T]he need for a mental illness to be treated could certainly be considered a serious medical need."); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996); *Wellman v. Faulkner*, 715 F.2d 269 (7th Cir. 1983).

To survive summary judgment on his claim that Schrubbe acted with deliberate indifference, Howard must supply evidence suggesting that she knew or recklessly ignored that officers often violated the medication distribution policy to his detriment. *See Robbins v. Pollard*, 734 F. App'x 366, 368 (7th Cir. 2018) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *Rosario v. Brown*, 670 F.3d 816, 821 (7th Cir. 2012); *see also Flynn v. Doyle*, 630 F. Supp. 2d 987, 992 (E.D. Wis. 2009) (granting plaintiffs' motion for preliminary injunction on requiring changes to prison medication distribution system based on finding that system of filling medication order posed substantial risk of serious harm to class members and defendant knew of risk but failed to take reasonable steps to abate it).

Howard has marshalled sufficient evidence that a jury could find that Schrubbe knew or should have known about Howard's repeated failure to receive his medication. For example, Howard filed thirty-eight offender complaints regarding his missed medications that were sent to Schrubbe for investigation. Howard was also directed repeatedly to seek help from Schrubbe before several of his offender complaints were accepted. Thus, the record supports a finding that Schrubbe knew about the problem.

The record would also permit a jury to find that Schrubbe failed to take reasonable steps that were within her power to address the problem. In 2009, Schrubbe spoke with Waupun's

17

security director and deputy warden about the numerous complaints Howard had filed between 2004 and 2009 regarding the unavailability of his medication and security staff not requesting timely refills.  That same year, an ICE Report was issued recommending that "a more specific tracking system should be developed for all aspects of Howard's medication needs" and that "a copy of the complaint will be sent to HSM Schrubbe and Security Director Strahota for follow-up on the medication delivery issue referenced above." (ECF No. 69-1 at 153 (Ex. 2009A-03)).  Also, the parties dispute whether Schrubbe acted in 2013 to address the medication delivery issues.  According to Schrubbe, she told nursing staff to automatically issue a thirty-day supply of Howard's medical on the seventh of every month.  Howard states that Schrubbe did not give this order and that, even if she did, her staff failed to carry it out.   The record thus supports a possible finding that Schrubbe could have done more to address the problem.

According to defendants, when Schrubbe worked at Waupun, there was no system in place for HSU to track whether the officers requested timely refills of the officer-controlled medications.  (ECF No. 105 ¶140.)  Defendants also state that HSU is not aware of a lapse in medications unless an inmate or security staff brings it to HSU staff's attention.  (*Id.*)  According to Howard, while he agrees that a better system could have been put in place during Schrubbe's fifteen years as health services manager, the med logs (DOC-3026) and medication profiles (DOC-3034) can be used to track whether timely refills are being sent.  (*Id.*)  Howard states that the profile tells the reader what the daily dosage is, how many doses the last refill contained, and when it was sent to the unit.  (*Id.*)  On this record, a reasonable factfinder could conclude that Schrubbe knew that the policy that officers dispense medication to inmates placed Howard at a substantial risk of harm and that she did not take remedial action to address the problem.  While she may not have had authority to change the entire policy, the record supports a possible finding that she could have done more.

Lastly, the defendants have argued that they are entitled to qualified immunity.  Qualified immunity "protects government officials from suit for damages when their conduct does not violate clearly established statutory or constitutional rights." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Determining whether a state official is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation."  *Williams v. City of Chi.*, 733 F.3d 749, 758 (7th

18

Cir. 2013). If either inquiry can be answered in the negative, the official is entitled to summary judgment.

Courts may address the two prongs of qualified immunity in either order. *Pearson*, 555 U.S. at 236. A right is clearly established if a "reasonable official would have understood what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotations and brackets omitted). Qualified immunity is not a defense available to officials sued in their official capacity. *See Kerr v. Puckett*, 967 F. Supp. 354, 362 (E.D. Wis. 1997) (citing *Flynn v. Sandahl*, 58 F.3d 283, 289 (7th Cir. 1995)). Thus, qualified immunity does not protect Schrubbe to the extent he sues her in her official capacity for declaratory relief.

Regarding Howard's individual capacity claim against Schrubbe, it is clearly established that inmates have an Eighth Amendment right to be free from cruel and unusual punishment and that officials violate that right if they are deliberately indifferent to inmates' serious medical needs. A reasonable prison official would have known that years of interruptions in prescribed medication, such as Howard experienced, would violate that right. *See Wellman v. Faulker*, 715 F.2d 269, 272 (7th Cir. 1983).

## CONCLUSION

In sum, the court will grant the defendants' motion for summary judgment as to O'Donovan and Callister. The court will deny summary judgment as to Schrubbe.

## ORDER

**THEREFORE, IT IS ORDERED** that the defendants' renewed motion for summary judgment (ECF No. 96) is **GRANTED IN PART AND DENIED IN PART** as described herein.

**IT IS FURTHER ORDERED** that defendants O'Donovan and Callister are **DISMISSED**.

**IT IS FURTHER ORDERED** that the Court will hold a telephone status conference on February 18, 2021 to discuss next steps.

Dated at Milwaukee, Wisconsin this 4th day of February, 2021.

BY THE COURT**:**

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge